## Catalano v. Worrilow

*Joel M. Breitstein,* for plaintiff.
*R. Hart Beaver* of *Beaver & Wolf,* for defendants.

GATES, P. J., March 9, 1972.—Plaintiff brings this action in mandamus to compel the city controller to comply with the Third Class City Code by auditing the Lebanon City Police Pension Fund from 1963 to date.

Defendants concede that the controller, acting upon erroneous advice, failed to perform his duties in this respect. However, the present city solicitor has properly advised him of his duty and he now has completed an audit for the year 1971. Defendants further contend that it would be a wasteful duplication of effort to require audits back to 1963, since the Auditor General of the Commonwealth audited the fund for this period.

Mandamus lies to compel a public official to perform statutory duties that are purely ministerial and not discretionary. Plaintiff has employed the appropriate remedy: Duncan Meter Corp. v. Gritsavage, 361 Pa. 607.

The duties of the city controller are clearly set forth in the Third Class City Code of June 23, 1931, P. L. 932, sec. 1704, as amended, 53 PS §36704, which directs the controller to annually audit the accounts, inter alia, of the police pension fund. The law can hardly be more specific. The audits ". . . shall be made within as short a time as possible after the close of the fiscal year, and be annually reported to council at its first meeting in March . . ." Further, brief abstracts or summaries of the audit report ". . . shall be published at least once a week for two weeks in one newspaper . . ." Copies of the audit must be filed with the court of quarter sessions, now Common Pleas, Crim-

inal Division, and posted in a conspicuous place in city hall.

In carrying out his duties, the controller has the power to administer oaths and subpoena city officers. Dire consequences befall anyone refusing to respond to the subpoena or give the desired information under oath. See section 1707 of the Act of 1931, supra, as amended.

It is readily apparent that the Auditor General's reports are no substitute for the duties imposed on the city controller. First, they need not be advertised, posted or filed with the court. Second, they are undertaken for an entirely unrelated purpose and need not reflect the matters which the public, the police, the police pension fund board and city council should know.

The seeds of this controversy lie in unfertilized soil. The proper role of the city controller, vis-a-vis, Auditor General, must be bared before an acceptable solution can be formulated. An audit back to 1963, apart from the performance of mandatory duties, if conducted in the form of the Auditor General's audits or the controller's 1971 audit, will be an exercise in futility so far as the underlying causes of this dispute are concerned. Of course, it must be done for the reasons herebefore stated. But, if nothing further is required, it will be meaningless.

The Third Class City Code merely demands the controller to audit the police pension fund. The law does not define the scope of the audit. This is unfortunate but not irremediable. We need only look to generally accepted business practices for guidance.

Business companies periodically have their financial statements and accounting records from which they are produced examined by independent accountants called auditors. After the examination, the re-

sults are reported to management in a carefully worded letter, usually in two paragraphs. The first paragraph describes the scope of the audit, and the second paragraph contains the auditor's opinion of the financial statement. If the opinion contains no exceptions or comments, it is characterized as a "clean" opinion. An opinion with exceptions or comments is a "qualified" one.

At first blush, the foregoing may appear unnecessarily academic, but it has a purpose. The point is this. Many people have the impression that the auditor is responsible for preparing the financial statements. This is not so. Preparation of the statements is the responsibility of the management, not of the auditor. This is practice in the commercial field. See Anthony, Management Accounting, 1970, 4th Ed., published by Richard D. Irwin, Inc.

The management of the police pension fund is entrusted to city council under the Third Class City Code of June 23, 1931, P. L. 932, sec. 4301, as amended, 53 PS §39301. The same statute authorizes council to transfer custody and management of the fund to others. This has been done by the adoption of ordinance 65-1962, article 175. Council has thereby delegated the custody and management of the police pension fund to the police pension fund board. The fund, however, remains at all times subject to the direction and control of council. It is the responsibility of the board to prepare an annual report of its financial activities. It then becomes the duty of the controller to audit the reports and accounting methods and render his opinion as outlined before.

We profess no expertise in accounting matters, but we do know that the financial report of the police pension fund must differ substantially in form from a financial statement of a business company. Further-

more, it should reflect information not necessarily required by the auditor general. In the "scope" paragraph of the State's audit, we learn that the examination of the books of accounts and records was made ". . . as they pertain to the financial operations of Police Pension Fund, City of Lebanon, Lebanon County with respect to the payments made to it by the State Treasurer from the tax paid upon premiums by foreign casualty insurance companies . . ." Thus, we have an audit of limited scope, not designed to reveal financial information that is necessary for the city controller to properly audit the fund. There is just not enough information in the State's audit for the controller to determine if applicable statutory law and ordinances are being observed.

For example, the 1964 State audit discloses that the City of Lebanon appropriated $2,500 to the fund. The Act of June 23, 1931, P. L. 932, sec. 4305, as amended, 53 PS §39305, requires the city to appropriate and pay annually into the fund a sum of money sufficient to meet the requirements of the fund. This sum shall in no year be less than one-half of one percent, nor more than three percent of all city taxes levied by the city. So, in order to audit this receipt item, the revenue of the city for the year 1964 should be reported. If the contribution by the city is less than one-half of one percent, the auditor should give a qualified opinion and demand compliance with the law by city council. This data should be made public through the controller's report of audit. The police and the public are entitled to know these matters. The same would be true if the audit discloses overpayments.

By way of further example, the police pension fund ordinance, supra, by section 173.05 requires each member policeman to contribute, by payroll deduction, four percent of his salary. The 1964 State audit dis-

closes police contributions of $6,094.21, but it does not report the 1964 police payroll. How then can the controller properly audit the account for compliance with the ordinance?

There are many other deficiencies in the existing State audits, and, perhaps, there are some of which we are unaware but could be found by a professional accountant. We find no fault with the Auditor General's report. We only note that its scope was limited, and the financial statements accompanying the report are inadequate for a proper audit by the city controller.

We also have before us an audit by the city controller for the year 1971. It is so filled with holes it would be better used to sift flour than disclose the fiscal health of the police pension fund. It has all the shortcomings we have referred to before and others as well. We do not imply misconduct or impropriety, but we find it woefully inadequate.

For example, it contains a statement of assets, at cost, as of December 31, 1971. This total is $458,927.-67. This figure is of little value to us, the police or the public. It serves no present purpose to know what the assets cost without knowing their present value. Knowledge of the difference between cost and present value would be quite useful in deciding how the principal of the fund is being managed. If the principal account is depreciating, serious thought must be given to buying, selling, or exchanging investments with the objective of stabilizing or, better, improving the value of the account.

Furthermore, by section 175.03 of the 1962 ordinance, the police pension fund must be divided ". . . as to principal and income." The reason is stated in the ordinance. All benefits are paid out of income. While the board is given authority to invade the principal account, the discretion is limited. The

principal account may not be depleted in an amount less than $175,000, plus donated funds. This limitation on the principal account must be based on current values, not cost. These requirements are not for ethereal purposes. Serious consequences follow. If and when the principal account is so depleted, benefits are paid out on a pro rata, obviously reduced, basis. This matter vitally concerns the police, and they are entitled to know the status of the account.

When an account is stated at cost, undivided as to principal and income, we fail to see how an audit can properly be made and a meaningful report prepared by the auditor.

The controller's report to the mayor and council is not enlightening and may be misleading. The report merely states that he examined the accounts of the treasurer of the fund ". . . and find the same correct according to the best of my knowledge and belief. . . ." What does this mean? We could ascribe the simple meaning that the treasurer's figures are correctly added. We could enlarge the meaning and conclude, for example, that the treasurer did indeed refund $239 to Mark Kristovensky. But can we conclude from the language that the refund was proper and legal? We think not. It would seem to be the better accounting practice to footnote a financial statement which contains an unusual transaction with more of an explanation than "refund."

We have not exhausted an analysis of the audits that have been made. We are not proficient enough to do so. However, it is apparent that they are inadequate to be properly audited.

Defendants have not only the right but the duty to compel the pension board to properly and adequately state their financial activities for each year from 1963 to 1971. The controller must then audit the statements

and accounts and report the results of his examination, advertise them, post them, and file them with the court. In that the controller and council have not performed their duty in this regard, the great writ of mandamus will issue to compel performance.

## ORDER

And now, to wit, March 9, 1972, judgment is entered for plaintiff and against defendants or their successors in office, and the writ of mandamus prayed for is ordered, returnable 90 days from this date.